In the

# United States Court of Appeals

## For the Seventh Circuit

No. 13-2860

LAND OF LINCOLN GOODWILL
INDUSTRIES, INC., an Illinois
Not for Profit Corporation,

*Plaintiff-Appellant*,

*v.*

THE PNC FINANCIAL SERVICES GROUP,
INC., a/k/a PNC Bank, NA,
a national bank,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Central District of Illinois.
No. 3:12-cv-03259-BGC — **Byron G. Cudmore**, *Magistrate Judge.*

ARGUED DECEMBER 13, 2013 — DECIDED AUGUST 12, 2014

Before EASTERBROOK, KANNE, and ROVNER, *Circuit Judges.*

ROVNER, *Circuit Judge.* When Land of Lincoln Goodwill
Industries, Inc. ("Goodwill") informed its lender, PNC Finan-
cial Services Group, Inc. ("PNC"), that it intended to pay off
the balance of its twenty-year loan early, PNC notified Good-

will that it would owe a prepayment charge in excess of $300,000. Goodwill filed suit seeking a declaratory judgment that it owes no such fee under the terms of its agreement with PNC. The district court concluded otherwise. It reasoned that because the contract terms impose a charge when prepayment is made "during a period when the unpaid principal balance bears interest, or is scheduled to bear interest, at a fixed rate," and Goodwill gave notice of its intent to prepay the balance of the loan during a ten-year period when interest on the loan was accruing at a rate of 4.79 percent per annum, Goodwill owes PNC a prepayment fee. R. 17; *see Land of Lincoln Goodwill Indus., Inc. v. PNC Fin. Servs. Grp.*, 2013 WL 2446375 (C.D. Ill. June 5, 2013). Goodwill appeals, contending that because the loan agreement called for a one-time adjustment of the interest rate ten years into the twenty-year loan period, at no time during the loan will interest accrue at a fixed rate, and consequently at no time will its prepayment trigger a charge. Because Goodwill's reading is contrary to the plain terms of the contract and would render one of its terms a nullity, we reject that reading and affirm the district court's judgment.

## I.

The loan transaction underlying the agreement in this case took place in October 2007 among Goodwill, Sangamon County, Illinois (the "County"), and PNC's predecessor, National City Bank ("National City"). The County agreed to issue $2 million in economic development revenue bonds and loan the proceeds to Goodwill for purposes of a development project. That project involved the acquisition and renovation of a building in Springfield to establish a retail thrift store along with training and counseling facilities for Goodwill's clients

and administrative facilities for its staff. The loan was for a period of twenty years. National City purchased the bonds and by so doing funded the loan to Goodwill. The transaction was evidenced by a loan agreement and promissory note, and the loan was secured by a mortgage on the project. The County's rights under the loan agreement were assigned to National City, which the loan agreement referred to as both the "Assignee" and the "Purchaser." PNC acquired National City on December 31, 2008, and succeeded to National City's rights under the agreement. For the sake of simplicity, we shall omit further mention of National City and substitute PNC in its place.

Although dated September 1, 2007, the loan agreement was signed on October 5, 2007, and the term of the loan commenced as of the latter date. The agreement and the note obligate Goodwill to make monthly payments of principal together with interest at one of two specified rates. The agreement specifies an "Initial Rate" of interest for the first ten years of the loan and an "Adjusted Rate" for the second ten years. The Initial Rate is deemed to be 4.79 percent per annum. That rate will apply until the Interest Rate Adjustment Date, which is identified as October 5, 2017 (ten years into the loan). The Adjusted Rate is defined as "the rate calculated on the Interest Rate Adjustment Date by Purchaser equal to the Purchaser's Cost of Funds on the Interest Rate Adjustment Date plus .80%." R. 1-1 at 15.

The parties entered into the loan agreement on the assumption that the Bonds constituted tax-exempt private activity bonds issued for a qualified purpose to be undertaken by a not-for-profit, section 501(c)(3) entity (Goodwill) and that, as a

result, the interest paid to the bondholder (PNC) would not be includable in its gross income. Anticipating the possibility that this assumption could turn out to be mistaken, and that interest on the bonds might later be deemed to be taxable, the loan agreement specifies that if and when a determination of taxability comes to pass, interest on the loan will thereafter accrue at a Taxable Interest Rate. The agreement defines the Taxable Interest Rate as "a rate of interest per annum equal to the Base Rate from time to time in effect." R. 1-1 at 21. The Base Rate is in turn defined as "the floating, daily, variable rate per annum of interest determined and announced by the Assignee from time to time as its 'Base Lending Rate' … ." R. 1-1 at 15. The Taxable Interest Rate is thus a variable rate. No determination of taxability has come to pass, but the agreement's provision for that possibility, including a variable Taxable Interest Rate that would apply in that event, sheds some light on the proper understanding of the terms governing a prepayment charge.

Article IV of the loan agreement specifies that the bond proceeds will be paid into a project fund to finance Goodwill's acquisition and renovation of the project property. Any unused funds are to be transferred from the project fund to a bond fund from which principal and interest payments to PNC are made and applied as set out in section 9.3 of the agreement and section 5 of the County resolution that authorized issuance of the bonds. We note these provisions of Article IV not because they are at issue in this case, but because they provide context for section 9.3 of Article IX, to which we turn next.

Article IX of the loan agreement confirms that Goodwill has the right to prepay, in whole or in part, the principal balance

owed on the note and identifies the circumstances under which Goodwill, if it exercises that option, will owe PNC a prepayment charge. The purpose of such a charge is to protect the lender against the loss of bargain it will incur if its borrower chooses to prepay the outstanding balance of the loan at a time when market rates have fallen below the interest rate specified by the loan. *See River East Plaza, L.L.C. v. Variable Annuity Life Ins. Co.*, 498 F.3d 718, 721 (7th Cir. 2007); *In re LHD Realty Corp.*, 726 F.2d 327, 330 (7th Cir. 1984). We reproduce the first four sections of Article IX here, omitting certain provisions (such as how prepayment may be made and how it is to be credited) that are not relevant to the arguments made in this case.

ARTICLE IX

PREPAYMENT OF THE NOTE

Section 9.1 General Optional Prepayment

The principal installments of the Note are subject to prepayment (concurrently with prepayment of the Bonds) at the option of [Goodwill] at any time, in whole or part, subject to the following prepayment charge (the "Prepayment Charge"):

(a) [Goodwill] shall have the right to prepay the principal installments of the Note in whole or part, *provided*, that … (iii) concurrently with the prepayment of the entire unpaid principal balance of the Note, [Goodwill] shall prepay the accrued interest on the principal being prepaid.

(b) If the Note is:

(i)       prepaid, in whole or in part, during a period when the unpaid principal balance bears interest, or is scheduled to bear interest, at a fixed rate, or

(ii)      accelerated after the occurrence of an an Event of Default hereunder, during a period when the unpaid principal balance bears interest, or is scheduled to bear interest, at a fixed rate,

and if, on the date of the occurrence of either (i) or (ii) above, … on the date of any subsequent prepayment for which a Funding Cost Recovery Charge is determined (each a *"Determination Date"*), the Reinvestment Rate is less than the Funding Cost, then a *"Funding Cost Recovery Charge"*, computed in accordance with the terms of the Funding Cost Recovery Charge Addendum, shall be payable by [Goodwill] to [PNC] at the time of prepayment or acceleration as applicable. …

The terms *"Reinvestment Rate"* and *"Funding Cost"* are defined in the Funding Cost Recovery Charge Addendum. [Goodwill's] execution of this Loan Agreement and the Note shall constitute acknowledgment that [Goodwill] has received a complete copy of the Funding Cost Recovery Charge Addendum. [PNC's] determination of the Funding Cost Recovery Charge shall be conclusive absent manifest error.

Section 9.2. <u>Optional Prepayment if Tax Exemption is Lost</u>.

If there shall have been made a Determination of Taxability, [Goodwill] shall have the option to prepay the Note in whole. The amount to be prepaid pursuant to this Section shall be equal to the principal amount of all Outstanding Bonds, plus accrued interest at the Taxable Interest Rate to their redemption date to the extent the interest is taxable income to the Registered Owners of the Bonds, plus any applicable Prepayment Charge. … In the event [Goodwill] does not exercise the instant option to redeem, then (i) the interest payable on all Notes then outstanding shall be adjusted to the Taxable Interest Rate, and (ii) [PNC] may demand prepayment by [Goodwill] of the Note.

Section 9.3. <u>Mandatory Prepayment upon Transfer from Project Fund</u>.

If any amounts are transferred from the Project Fund to the Bond Fund pursuant to Section 4.5 of this Loan Agreement, [Goodwill] shall prepay the Note in an amount equal to the principal amount of the Bonds required to be redeemed on such an occurrence pursuant to Section 5 of the Bond Resolution, plus any applicable Prepayment Charge. Said amount shall be paid by [Goodwill] to [PNC] not later than the date the Bonds are to be redeemed pursuant to such provision.

> [Goodwill] will promptly notify the Issuer and [PNC] in writing of the occurrence and existence of an event which will result in mandatory prepayment under this Section 9.3.

> Section 9.4. <u>Notice of Prepayment</u>.

> To exercise an option granted by Section 9.1 or 9.2, [Goodwill] shall give written Notice to the [County and PNC], … which shall specify therein the date upon which a prepayment of the Note (or a portion thereof) will be made … .

R. 1-1 at 47–48 (emphasis in original).

The subjects of prepayment and a charge for such prepayment were also briefly addressed in the note.

> The principal installments of this Promissory Note are subject to prepayment (concurrently with prepayment of the Bonds) at the option of [Goodwill] at any time, in whole or in part, with a prepayment charge as set forth in the Loan Agreement.

R. 1-1 at 62.

The Funding Cost Recovery Addendum (the "addendum") referred to in section 9.1 of the loan agreement sets forth the formula for calculating the prepayment charge. That formula calls for a calculation of an interest rate differential "[f]or each period that bears interest, or is scheduled to bear interest, at a known fixed rate," and then employs that differential to arrive at the funding cost recovery charge. R. 14-1 at 1. There is no dispute that the "prepayment charge" referenced in the note is synonymous with the "funding cost recovery charge" refer-

enced in both the loan agreement and the addendum. Like the loan agreement and the note, the addendum was dated October 5, 2007, and was signed by Goodwill's Chief Executive Officer; the addendum expressly reflects the parties' intent that it be made part of the note. *See Davis v. GN Mortg. Corp.*, 396 F.3d 869, 879 (7th Cir. 2005).

An Internal Revenue Service ("IRS") Form 8038, entitled "Information Return for Tax-Exempt Private Activity Bond Issues," was completed by the County as part of the loan transaction. As its title suggests, this form is prepared by the issuer of tax-exempt private activity bonds like the ones issued in this case; the County therefore completed the form. Line 21 of the form as completed describes the yield on the bonds as a "Variable Rate." R. 1-2 at 54. The completed form was filed with the IRS.

On March 30, 2012, less than four and one-half years into the loan, Goodwill notified PNC that it would prepay the loan in full on May 17, 2012. PNC responded on April 3, 2012, by sending Goodwill a calculation of the loan payoff amount as of April 4, 2012, which included a prepayment charge of $404,619.01 pursuant to section 9.1(b) of the agreement. PNC subsequently prepared and sent to Goodwill two additional calculations assuming payoff dates of May 9, 2012, and June 27, 2012, which included prepayment charges of $300,200.82 and $303,131.24, respectively.

On August 23, 2012, Goodwill filed suit in Illinois state court for a declaratory judgment; PNC removed the litigation to federal court based on diversity of citizenship between the parties. Goodwill contends that because the loan was properly

characterized as an adjustable-rate loan rather than a fixed-rate loan, there is no time during the loan period during which interest can be said to accrue at a fixed rate. Consequently, in Goodwill's view, section 9.1 of the loan agreement does not apply and no prepayment charge is owed.

The magistrate judge, to whom the parties had submitted the case for final disposition, disagreed. R. 17. In his view, sections 9.1 and 9.2 of the agreement should be understood as providing for two different scenarios that might occur with respect to the interest rate that Goodwill must pay over the life of the loan. In the first scenario, the bonds are deemed to be tax-exempt as the parties assumed, and thus Goodwill will pay interest on the loan funded by the bond proceeds at the Initial Rate of 4.79 percent annually for the first ten years of the loan, and interest at the Adjusted Rate for the second ten years. Section 9.1 is meant to govern any prepayment of principal that Goodwill would make in that scenario. In the second scenario, interest on the bonds is deemed taxable, contrary to the parties' anticipation, and consequently Goodwill becomes obliged to pay interest at the Taxable Rate, which varies on a daily basis. Section 9.2 of the agreement governs that scenario; and if Goodwill should decide to prepay any portion of the principal following a determination of taxability, under section 9.2, it would owe no prepayment charge. As noted, there has been no determination of taxability, and so when Goodwill gave notice of its intent to prepay the outstanding principal in full, interest was accruing at the fixed, Initial Rate of 4.79 percent per annum. In the magistrate judge's view, then, section 9.1(b) imposed a prepayment charge. R. 17 at 14–17.

The magistrate judge rejected Goodwill's contention that section 9.1 should be understood as surplusage, a contention premised on the notion that, in the absence of one specified interest rate for the full twenty-year term of the loan, interest can never be said to accrue at a fixed rate. This was not a circumstance, the magistrate judge pointed out, in which a loan officer was simply filling in blanks on a preprinted form; "[r]ather, these documents were prepared for this specific transaction by the County's bond counsel in cooperation with National City." R. 17 at 17–18. Consequently, the normal rules of contract interpretation apply, including in particular the goal of giving meaning to all provisions of the contract and avoiding an interpretation that renders any provision or term surplusage. Simply because the interest rate on the bonds could be described as "variable," as it is on the Form 8038, does not mean that there is no period during which interest on the loan (and thus the bonds) is accruing at a fixed rate of interest. The "fixed rate" language in section 9.1(b) refers not to the overall yield on the bond issue or the overall term of the loan but rather to a period of time during the loan term when prepayment will trigger a corresponding charge. At the point in time when Goodwill gave notice of its intent to make prepayment, interest was accruing at a fixed annual rate of interest. Goodwill's decision to prepay the principal thus triggered a prepayment charge. R. 17 at 17–21.

As there are no claims as to the enforceability of section 9.1 nor any dispute as to the accuracy of PNC's calculations of the charge owed, the magistrate judge granted PNC's motion for judgment on the pleadings, denied Goodwill's cross-motion, and entered judgment for PNC. R. 17 at 21–22. He also denied

Goodwill's subsequent motion to alter or amend the judgment, which essentially was a request that the court reconsider its decision. R. 22.

**II.**

Our review of the district court's Rule 12(c) decision is, of course, *de novo. E.g., Ball v. City of Indianapolis*, No. 13-1901, — F.3d —, 2014 WL 3673466, at *5 (7th Cir. Jul. 25, 2014). As the parties agree, the correct understanding of a contract presents a question of law for the court. *E.g., Hanover Ins. Co. v. Northern Bldg. Co.*, 751 F.3d 788, 791 (7th Cir. 2014). The parties specified that the loan agreement is to be governed by Illinois law (R. 1-1 at 52) and, accordingly, we apply that state's rules of contractual interpretation. *Id*. at 792. Our prime objective is to effectuate the intent of the parties. *Id.* (citing *C.A.M. Affiliates, Inc. v. First Am. Title Ins. Co.*, 715 N.E.2d 778, 782 (Ill. App. Ct. 1999). We do that by enforcing the contract as the parties have written it, as the plain language of the contract is the best evidence of the parties' intent. *E.g., Marlowe v. Bottarelli*, 938 F.2d 807, 812 (7th Cir. 1991); *Smith v. West Suburban Med. Ctr.*, 922 N.E.2d 549, 552–53 (Ill. App. Ct. 2010); *see also Hanover Ins. Co.*, 751 F.3d at 792. We look to the contract as a whole in interpreting its individual terms, adopting an understanding of the language that is natural and reasonable. *Id.* at 553. And, as the district court noted, whenever possible we attempt to give meaning to every provision of the contract and avoid a construction that would render a provision superfluous. *E.g., Kim v. Carter's, Inc.*, 598 F.3d 362, 364 (7th Cir. 2010) (citing *Hot Light Brands, L.L.C. v. Harris Realty Inc.*, 912 N.E.2d 258, 263 (Ill.

App. Ct. 2009)); *Matthews v. Chicago Transit Auth.*, 9 N.E.3d 1163, 1188 (Ill. App. Ct. 2014).

Section 9.1 of the loan agreement is the controlling provision with respect to this dispute. Neither section 9.2 nor section 9.3 would apply to the facts presented: there has been no determination that the bonds are taxable, the scenario addressed by section 9.2, nor has there been any transfer of funds from the project fund to the bond fund, as referenced in section 9.3. What has occurred is Goodwill's notification that it intends to prepay the outstanding balance of the loan. Pursuant to section 9.1, that notice triggers a prepayment charge if it was given during a "period" when interest on the loan can be said to accrue at a "fixed" rate. PNC's view is that because Goodwill gave notice during the first ten years of the loan, a period of time for which the loan agreement specifies an annual interest rate of 4.79 percent that remains unchanging for the entire ten-year period, notice was given during a period during which interest was accruing at a fixed rate. Goodwill, on the other hand, contends that because the loan agreement specifies one interest rate for the first half of the loan term (the Initial Rate of 4.79 percent), and another interest rate for the second half of the loan term (the Adjusted Rate), the loan is necessarily an adjustable-rate loan and neither of the rates it specifies for the two halves of the twenty-year loan term can properly be described as a fixed rate.

PNC's view reflects the better understanding of the contract terms. It is consistent with an ordinary understanding of the terms "period" and "fixed" found in section 9.1. And unlike Goodwill's construction, it avoids rendering section 9.1 superfluous, while giving that provision at least some work to

do, in conjunction with section 9.2., in distinguishing between situations in which a prepayment fee will be owed and at least one situation in which it will not be owed.

The terms of section 9.1 render Goodwill liable for a prepayment charge if Goodwill gives notice of its intent to prepay the loan, in whole or in part, "during a period when the unpaid principal balance bears interest, or is scheduled to bear interest, at a fixed rate[.]" R. 1-1 at 47. As of March 30, 2012, when Goodwill gave notice of its intent to prepay the loan in full (on May 17, 2012), interest on the outstanding principal balance of the loan was accruing at an annual rate of 4.79 percent. The loan agreement specified that Initial Rate of interest for the first ten years of the twenty-year loan. That ten-year interval certainly qualifies as a "period," and as a single rate of interest applies to that entire ten years, the rate can readily be understood as "fixed" for that period.

Goodwill's contrary understanding focuses on the fact that the Initial Rate does not govern for the entire life of the loan; instead, the loan agreement specifies a second rate—the Adjusted Rate—for the second half of the loan term. Vis-à-vis the twenty-year term of the loan, then, there is no "fixed" rate, but rather a variable rate that adjusts once, ten years into the loan term. Section 9.1, however, does not ask whether there is a single rate for the whole of the loan term nor does it ask whether the loan itself may be described as a fixed-rate loan or an adjustable-rate loan. It turns instead on whether notice is given during a "period" (*i.e.*, an interval of time) when interest accrues at a fixed rate. The term "a period" can readily be understood to include each of the two ten-year halves of the loan term. It is by no means uncommon for loan agreements to

specify different rates of interest for different segments of the loan term; indeed, agreements which specify an initial fixed rate, which after some interval reverts to a variable rate, are quite familiar. *See, e.g.*, *United States v. Phillips*, 731 F.3d 649, 651 (7th Cir. 2013) (en banc) (describing typical terms of stated-interest loans offered by subprime mortgage lender prior to 2008 financial collapse). Common parlance would deem the rate "fixed" during the initial interval, even if the loan itself would be described as an "adjustable-rate" or "hybrid" loan.

Of course, any adjustable-rate loan can be broken down into periods of some length, and we can imagine Goodwill arguing that on PNC's view, even if the loan agreement called for daily re-calculation of the interest rate, notice given on any particular day could be described as being given during a twenty-four hour "period" when interest was accruing at a fixed rate. But this does not answer why, in the context of an agreement that calls for a one-time adjustment of the interest rate over the course of a substantial loan term, thereby creating two distinct intervals in the life of the loan, each interval may not be described as a period during which interest accrues at a single, fixed rate.

This is also where the interpretive goal of giving meaning to each provision of the contract comes to the fore. On Goodwill's understanding of the contract, section 9.1 has no role to play whatsoever: as there is no single rate that governs for the entire term of the loan, there will be no "period" during which interest accrues at a fixed rate. This understanding renders superfluous not only section 9.1, but also the addendum that Goodwill's CEO signed, which in turn sets forth the means of calculating the prepayment charge. Goodwill's counsel has

indicated that although the terms of the loan were negotiated, the parties used a form contract; and we recognize that form provisions occasionally can be rendered superfluous by the parties' negotiations and revisions. This possibility leaves unexplained why Goodwill would also be signing an addendum that could have no application on its understanding of the contract terms.

PNC's construction of the agreement, by contrast, gives at least some meaningful task for section 9.1 to perform. At first blush, it might seem that if each of the two ten-year segments of the loan qualifies as a "period" during which interest is accruing at a fixed rate—the Initial Rate during years 1 through 10, and the Adjusted Rate in years 11 through 20—then there is no instance in which Goodwill would *not* owe a prepayment charge. That possibility leads one to wonder why the contract does not simply declare that if Goodwill elects to prepay the balance of the loan in whole or in part, it will owe a prepayment charge, period. But as PNC has pointed out, there is at least one scenario in which interest on the principal would accrue at a variable rate—if interest on the bonds were deemed taxable. Section 9.2 of Article IX provides that in the event of a determination of taxability, interest on the outstanding balance of the loan would thereafter accrue at the Taxable Interest Rate.[1] As we mentioned earlier, the Taxable Interest Rate is

---

[1]    In the event of a determination of taxability, section 9.2 also grants to Goodwill the option to make prepayment of the note in full. (PNC is likewise given the option of demanding prepayment.) However, our discussion assumes that Goodwill would not choose to prepay the loan in full immediately upon such a determination (or that PNC would demand

(continued...)

defined as being equal to the Base Rate, which in turn is PNC's Base Lending Rate, a "floating, daily, variable rate per annum of interest." R. 1-1 at 15, 21. In that scenario, then, interest would no longer be accruing at a fixed rate of interest but a variable rate of interest. Consequently, if, at a later date, Goodwill chose to exercise its right under section 9.1 to prepay the loan in full or in part, it would owe no prepayment charge, as interest would then be accruing at a variable rate of interest.[2] On this understanding, section 9.1 and its reference to a period in which interest is accruing at a fixed rate plays at least a limited role, when read together with section 9.2, in distinguishing between situations in which Goodwill would or would not owe a prepayment charge.

For these reasons, we sustain the district court's interpretation of section 9.1. Because Goodwill gave notice of its intent to make prepayment during the ten-year period of the loan during which interest on the outstanding principal was accruing at the Initial Rate of 4.79 percent per year, Goodwill owes a prepayment charge.

---

[1] (...continued)
it), and that interest would thereafter accrue at the variable Taxable Interest Rate.

[2] Section 9.2 does obligate Goodwill to remit "any applicable prepayment charge," but as the district court pointed out, this must refer to a charge resulting from a prior, partial prepayment, because Goodwill would not otherwise owe a prepayment charge for a prepayment made during a period when interest is accruing at the Taxable Rate of Interest, which is a variable rate. R. 17 at 15–16.

## III.

The district court correctly concluded that section 9.1 of the Loan Agreement imposes a prepayment charge on Goodwill and properly granted judgment on the pleadings to PNC on that basis. We AFFIRM the judgment.